## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

LUIS GOMEZ-ECHEVERRIA, ET AL.,

        Plaintiffs/Counter-Defendants,

v.

PURPOSE POINT HARVESTING LLC,
ET AL.,

        Defendants/Counter-Plaintiffs.

Case No. 22-CV-314

Hon. Jane M. Beckering

| **Migrant Legal Aid** | **Avanti Law Group, PLLC** |
|---|---|
| Teresa Hendricks (P46500) | Robert Anthony Alvarez (P66954) |
| Benjamin O'Hearn (P79252) | Attorney for Defendants/Counter-Plaintiffs |
| Molly Spaak (84730) | 600 28th St. SW |
| Attorneys for Plaintiffs/Counter-Defendants | Wyoming, MI 49509 |
| 1140 Fuller Ave., Ne | 616-257-6807 |
| Grand Rapids MI 49503 | |
| 616-454-5055 | |

### DEFENDANTS' COUNTERCLAIMS AGAINST PLAINTIFFS

NOW COME the Counter-Plaintiffs, by and through their attorneys the Avanti Law Group, PLLC, and in their Counterclaim state as follows:

1.    This is a civil action brought under for Breach of Contract, Common Law Fraudulent Misrepresentation, Silent Fraud, Intentional Infliction of Emotional Distress and Civil Conspiracy on behalf of Counter-Plaintiffs. Counter-Plaintiffs complain that the Counter-Defendants participated in, engaged in, and continue to engage in, a pattern of fraud and malicious or intentional acts in which they conspired in an effort to defraud the United States government and essentially extort money from the Counter-Plaintiffs in an effort to accomplish their goal of legally remaining in the United States under a U or T visa. Counter-Plaintiffs seek a declaration that their rights have been violated and that they were harmed by those acts as well as that they be awarded damages for Counter-Defendants' unlawful conduct.

### JURISDICTION

2.    This Court has subject matter jurisdiction over Counter-Plaintiffs' federal claims pursuant to 28 U.S.C. § 1332 (Diversity Jurisdiction) as well as being compulsory counterclaims in the underlying action.

3.     This Court also has supplemental jurisdiction pursuant to 28 U.S.C. §1367 over Counter-Plaintiffs' state law claims that may not be covered by diversity jurisdiction.

## VENUE

4.     Venue is proper pursuant to 28 U.S.C. §1391(b) as a substantial part of the events giving rise to this action occurred within this district and the Defendants/Counter-Plaintiffs reside within this district.

## PARTIES

5.     Counter-Plaintiff Emilto Moreno Gomez (hereinafter referred to as "Emilto") is an individual residing in Oceana County.

6.     Counter-Plaintiff Purpose Point Harvesting, LLC (hereinafter referred to as "Purpose Point") is a Michigan Limited Liability Company who had a principal place of business in the city of Hart, Oceana County.

7.     Counter-Plaintiff Lucille Jean Moreno (hereinafter referred to as "Lucille") is an individual residing in Oceana County.

8.     Counter-Defendant Luis Gomez-Echeverria (hereinafter referred to as "Luis") is citizen of Guatemala.

9.     Counter-Defendant Hervil Gomez-Echeverria (hereinafter referred to as "Hervil") is a citizen of Guatemala.

10.    Counter-Defendants were employed by Defendant Purpose Point

## FACTS

11.    Luis and Hervil are first cousins of Emilto.

12.    Luis and Hervil are brothers.

13.    Purpose Point arranged for Luis and Hervil to obtain guest worker visas under the H2-A program[1] between 2017 and 2019.

14.    They both agreed to comply with all the terms and conditions of the work contracts in each of the years in which they worked for Purpose Point. See ECF 13-6 PageID 364-458.

15.    By accepting employment with Purpose Point in each of those years, Luis and Hervil represented that they understood and were ready, willing and able to comply with the terms and conditions of the work contracts.

16.    Among those terms and conditions that Luis and Hervil agreed to follow were the following:

---

[1] Counter-Defendants incorporate by reference paragraphs 21 through 25 of ECF 13 - Plaintiffs' Amended Complaint.

a.  Anticipated period of employment;

b.  Anticipated hours of work per week;

c.  Are available and willingness to work the entire season;

d.  Persons seeking employment in this position must be available for the entire period requested by the employer;

e.  Any employee who is terminated for cause will not be entitled to the ¾ guarantee;

f.  Five consecutive workdays of unexcused absences shall constitute abandonment of employment and result in termination;

g.  The employer prohibits the payment of recruitment fees by workers. If a worker is asked to pay such a fee or has actually paid such a fee, he or she shall inform the employer immediately so that the employer can take appropriate action;

h.  Return transportation will not be provided to workers who voluntarily abandon employment before the end of employment period or who are terminated for cause;

i.  Must be able, willing and qualified and be available at time and place needed to perform the work;

j.  Employer may terminate the worker for:

   i.   Abandonment of employment;

   ii.  Commits serious acts of misconduct or serious or repeated violations of the employer work rules;

   iii. Other lawful job related reasons for termination of employment.

k.  Violation of lawful job related employer requirements, including the work rules, will be considered grounds for immediate termination;

l.  No use, possession of beer, liquor, or illegal drugs is permitted during work time or during any workday before work is completed for the day - workers may not report to work under the influence of beer, liquor or illegal drugs;

m.  Workers may not leave the field or other assigned work areas without permission of the employer or person in charge;

n.  Workers may not deliberately restrict production;

o.  Any worker who physically threatens another worker, the employer or any supervisor will be immediately terminated;

p.  Workers will be discharged for fighting on the employer's premises, including housing premises, at any time;

    q.   Workers will be discharged if they steal from fellow workers or the employer;

    r.   Workers must be present, able and willing to perform every scheduled workday at the scheduled time unless excused by the employer;

    s.   Workers are prohibited from harassing others and engaging in abusive behavior of any kind.

    t.   Workers may not reveal confidential or proprietary business information to any third party.

17.    Despite agreeing to these terms and conditions, Luis and Hervil violated many of the terms and conditions of employment including, but not limited to, abandonment of employment.

## HERVIL

18.    Counter-Plaintiffs have discovered that Hervil had no intention of fulfilling the terms of the work contract and had pre-planned his abandonment of employment prior to the end of the period of employment for which he was hired.

19.    When Hervil applied to and accepted employment with Purpose Point, he had the intention of pursuing all means necessary to obtain legal status in the United States including as a victim of a crime or victim of trafficking.

20.    Hervil impregnated a young woman in Guatemala and refused to acknowledge the paternity of the child and to avoid the financial and other obligations that would come from it, Hervil planned on utilizing the work opportunity provided by Purpose Point solely in order to enter the United States legally.

21.    The young woman and her family had been threatened by Hervil and/or his father, Luis Gomez-Castro - who had been employed as a law enforcement officer in Guatemala.

22.    The child died after it's one year birthday under mysterious circumstances.

23.    Hervil traveled to Michigan under the visa provided to him by Purpose Point and worked for a few months only in order to save up money for his planned abandonment of work.

24.    Hervil had no intention of of abiding by or complying with the terms and conditions of employment, which is why he left only five months after having arrived in Michigan.

25.    Hervil's work performance was subpar and he was antagonistic with the other workers, aside from his brother Luis.

26.    In fact, Hervil called Emilto a few days prior to his abandonment of work and stated that he wanted to return to Guatemala and wanted his paycheck early for that week.

27.    However, Hervil left before he was able to cash the check and Emilto received a call from the local Mexican store indicating that Luis had cashed the checks belonging to Hervil passing himself off as Hervil.

28.    Hervil abandoned the employment at Purpose Point the weekend of the 22nd of September in 2018.

29.    The store owner, upon discovering that Luis was not the person to whom the checks were made out to, called Emilto to have him tell Luis to return to the store immediately with the money or she would have to report the incident to the local police.

## LUIS

30.    Luis was a team leader of a crew of seven workers in 2018 and 2019.

31.    As team leader Luis was responsible for tracking and recording the work the crew performed on a daily basis whether it by hour worked or piece/production rate.

32.    Beginning in July 2019, Emilto noticed that the crew in which Luis was working began acting strange and out of character.

33.    Luis began asking for additional blank time keeping reports which was out of the ordinary.

34.    The crew was not working as productively as they had before and had become distant and withdrawn from the other workers.

35.    In fact, Luis' crew often declined to take on additional work where normally it's common practice for the workers to want to make more money if the opportunity arose.

36.    Emilto eventually went to speak to the workers directly, in early September 2019, to inquire about their change in behavior as they had, until then, had very friendly and family oriented atmosphere.

37.    The workers were quiet, withdrawn, obviously uncomfortable and appeared to be afraid of something and would often look at Luis when a question was asked and then would look away quickly and to the floor but refused to answer any questions or make any comments.

38.    Luis, however, did speak up and made several angry and aggressive comments including that he would leave Purpose Point with blood and his papers in his hands.

39.    His statement about leaving Purpose Point with papers in his hands was a reference to his goal was to remain legally in the United States by any means necessary including either as a victim of a crime or the victim of trafficking so that he could apply for a U or T visa.

40.    He also stated that but for the fact that there was blood in common between him and Emilto, he would have already beaten him up.

41.    Emilto then confronted Luis as to a time keeping report that he had submitted for the crew which seemed to indicate that they had all worked only three hours in one day for picking zucchini.

42.    This was unusual and stood out because it was less than half of the typical amount of time expected for the amount of work that needed to be done on that day.

43.  Luis responded to Emilto by stating that he had only included the three hours "to try to help you out".

44.  Luis confirmed that he and the other workers had worked in fact worked approximately six hours that day and his having not included all the hours worked would have meant that the crew would not receive their full pay for that day's work.

45.  Emilto told Luis that this was unacceptable and that it needed to be corrected immediately.

46.  Luis asked to keep the report overnight and said that he would fix it and turn it in the following day.

47.  Emilto refused to leave the report with him overnight and instead, met him the following the morning and had Luis correct the report in front of the crew and initial the correction.

48.  Luis abandoned employment at Purpose Point on November 3, 2019.

49.  After he abandoned the employment, the members of his crew were visibly happy to have him gone and indicated such to Emilto and the other workers.

50.  It was not until after the filing of the underlying lawsuit by Luis, and having spoken to the workers about the pending lawsuit, that the members of his crew told Emilto and the other workers at Purpose Point that Luis had planned on abandoning the employment, had been working with some organization that had promised to get him money and his legal status before he left in 2019.

51.  In fact, they stated that Luis had attempted to convince them to join him in abandoning their employment and support his claims against the Purpose Point, Emilto and Lucille.

52.  Additionally, Emilto learned that Luis had engaged in a campaign to attempt to recruit current and former workers to support his claims despite their falsity with promises of money and, more importantly, legal status.

53.  Furthermore, Emilto has since learned that Luis and Hervil had sought the aid of a former worker named Darwin Fuentes to attempt to recruit additional individuals who would be willing to lie in an effort to support Luis and Hervil's claims against Purpose Point, Emilto and Lucille.

54.  Darwin resides in Guatemala and at one point, a worker who had been approached by Darwin in his campaign to recruit support  and refused to participate in their scheme was compelled to file a police complaint against Darwin for the threats that followed his refusal.

55.  Luis and Hervil's father, Emilto's uncle, has also been engaged in a campaign in Guatemala to attempt to coerce current and former workers to support their scheme with similar promises of money and legal status.

56.    Their father has directly threatened several of the workers' family members for refusing to support the claims and more recently engaged in witness intimidation in an effort to silence the workers and/or their families from speaking out against Luis.

57.    It has also come to light that Luis himself was engaging in the very actions he was accusing the Counter-Plaintiffs of by having required members of his work crew to pay him $500 each for the privilege of continuing and/or returning to work for Purpose point.

58.    These monies were collected here in the United States in cash.

59.    It was also reported to Emilto that Luis often times engaged in drinking alcoholic beverages during work hours and would at times threaten members of his crew to not report his drinking lest they not return to work the following year.

60.    One worker recently also reported that Luis physically assaulted him while they were at the housing premises after refusing to support Luis' claims against Emilto, Lucille and Purpose Point at the end of July 2019.

61.    Another worker also reported that Luis forced/coerced/threatened him to run over a phone Luis had stolen from another worker with a fork lift.

62.    Luis used his familial status with Emilto as a sword against the members of his crew and possibly other workers unbeknownst to Emilto or Lucille.

63.    Luis also attempted to convince workers to support his claims by stating that he would soon be opening up his own business providing labor once Purpose Point was put out of business because of the lawsuit.

### Lawsuit and Campaign Against Counter-Plaintiffs

64.    Prior to the filing of the underlying lawsuit by Luis and Hervil, Counter-Plaintiffs learned of others that were involved in a campaign against them and in support of Luis and Hervil.

65.    Several former workers have reported receiving phone calls from Luis specifically asking them to support his allegations against Counter-Plaintiffs despite his acknowledgement that they are false.

66.    Luis' stated purpose on those calls was to attempt to convince them that it is in their interest to support him in the lies because they will get money from the lawsuit and legal status.

67.    A former worker of Purpose Point was given access by Darwin Fuentes himself to his cellular phone and observed that there were messages sent/received by Ruby Salgado, a then and current worker of Michigan Works! working out of the Shelby office.

68.    In those messages, it was revealed that either Ruby Salgado and/or some other organization were tracking workers via some sort of GPS device as well as guiding and directing their actions against Counter-Plaintiffs.

69. It was also discovered in these text messages that Counter-Defendants were provided with a listening/recording device by an agency or organization that was to be used during their interaction with Emilto and Lucille.

70. The purpose of the eavesdropping device was to attempt to fabricate evidence to be used in support of their goal of remaining legally in the United States under a U or T visa.

71. Those text messages further confirmed that Luis and Darwin were acting in concert with others to build in and participate in a campaign to bring false claims against Counter-Plaintiffs in order to obtain a monetary windfall but more importantly, obtain legal status in the United States.

72. The phone contained recorded conversations between the workers and Emilto with the seemingly insidious purpose of attempting to make it appear as if the workers were somehow being mistreated.

73. In fact, in one recorded conversation, Darwin was speaking to Emilto and mentioned that he would be unable to pay him this year because he had some outstanding expenses in Guatemala.

74. That conversation, and hence the money Darwin was referring to, was related to money that Emilto loaned to Darwin to pay for his wedding and not related in any way to any alleged recruitment fees.

75. However, the fact that this conversation was recorded and the way in which Darwin approached Emilto about the money makes it clear that he was attempting to produce support for the alleged recruitment fees.

76. Luis, Darwin and Hervil all knew that their allegations of mistreatment and alleged charging of recruitment fees were false and not based in fact.

77. Finally, the campaign against Counter-Plaintiffs did not end with Luis, Hervil, their father or Darwin as others were also involved in a smear campaign against the Counter-Plaintiffs.

78. On or about April 30, 2022, a press release regarding the underlying litigation titled "Michigan's Labor Trafficking Problem" was sent out to Purpose Point clients with an apparent intent of furthering the Counter-Defendants' campaign of lies and to embarrass/humiliate Counter-Plaintiffs.



79.     This message includes the unnecessary highlighting of Emilto's criminal conviction which is irrelevant, immaterial and wholly unrelated to the underlying claims.

80.     It also specifically included a link to a list of Purpose Point clients for no other reason than to attempt to shame those clients for their connection or working relationship with Purpose Point.

81.     More recently, former and potential workers have been receiving phone calls from a phone number based in Guatemala from an individual named Guadalupe Sepulveda claiming to be from the U.S. Embassy.

82.     Mr. Sepulveda, who to the best of Counter-Plaintiffs' knowledge does not work for the US Embassy, called these former and potential workers directly on their cell phones and addressed by name.

83.     He was making inquiries of the workers that made them fearful and apprehensive about their employment with Purpose Point.

84.     Luis' father also recently told another former worker in Guatemala that he was a traitor for not supporting Luis' and Hervil's claims against Counter-Plaintiffs.

85.     The original complainant filed in this matter made a point to highlight the allegations brought under the Racketeer Influenced and Corrupt Organizations Act (RICO). ECF 1

86.     Counter-Defendants accused Counter-Plaintiffs of having committed fraud in foreign labor contracting by "charging workers for the opportunity to work". ECF 1 PageID 10.

87. Those allegations were voluntarily dismissed after the Counter-Plaintiffs' filing of a Motion to Dismiss. ECF 8.

## COUNT I - BREACH OF CONTRACT

88. Counter-Plaintiffs reallege and incorporate by reference all previous paragraphs as if fully set forth herein.

89. The Parties entered into a mutually beneficial agreement in which Counter-Plaintiffs would petition for Counter-Defendants to travel to the United States under a guest worker visa that allowed them to work legally in the United States and which generously provided many guarantees.

90. The terms and conditions of the agreement were clear, unambiguous and in a language all parties could understand.

91. The Counter-Plaintiffs fulfilled their obligations under the agreement each year.

92. Both Counter-Defendants both failed to comply with their obligations under the agreement including but not limited to those listed in paragraph 16 above.

93. Additionally, Counter-Defendants violated many of the stated work rules and conditions of employment during their employment including deliberately restricting production or engaging in a work stoppage or slow down.

94. As a direct and proximate result of Counter-Defendants breach of the agreements, Counter-Plaintiffs have suffered damages in excess of $75,000.

## COUNT II: FRAUDULENT MISREPRESENTATION

95. Counter-Plaintiffs reallege and incorporate by reference all previous paragraphs as if fully set forth herein.

96. Counter-Defendants made several representations to Counter-Plaintiffs based on their acceptance of employment and their agreement to comply with the terms, conditions and work rules of the employment offered.

97. Among those representations were that they would comply with the terms of the guest worker visa and return to Guatemala at the end of the employment period.

98. They knew that they had no intention of returning to Guatemala at the end of the employment periods in 2018 and 2019.

99. Their true intention was to remain in the United States by any means necessary, including making false allegations of labor and trafficking violations so that they could apply for a U visa or T visa which would permit them to remain in the United States without the need for the guest worker visa.

100.    Plaintiffs rightfully relied on the representations of Counter-Defendants and would have acted differently had it not been for those misrepresentations and/or omissions.

101.    Those representations were material and caused the Counter-Plaintiffs to incur considerable liabilities including the loss of the labor to be provided by Counter-Defendants in reliance of those representations.

102.    Those representations were false and the Counter-Defendants knew of their falsity at the time they accepted the employment offered.

103.    Counter-Plaintiffs did not know and could not have known of the falsity of the representations.

104.    Counter-Plaintiffs suffered damages in excess of $75,000 from those false representations.

## COUNT III - SILENT FRAUD

105.    Counter-Plaintiffs reallege and incorporate by reference all previous paragraphs as if fully set forth herein.

106.    Counter-Defendants had an obligation to disclose facts that were material to their qualifications, ability, and willingness to fully perform their obligations under the agreement.

107.    They also failed to disclose that they were seeking to remain in the United States by any means necessary, including making false allegations of labor and trafficking violations so that they could apply for a U and/or T visa.

108.    Their failure to disclose and their silence in acceptance without condition of the terms of the employment agreement was done with the intent to induce Counter-Plaintiffs to act in a manner which was beneficial to Counter-Defendants.

109.    Their failure to disclose and their silence was done with the intention to mislead the Counter-Plaintiffs into relying on their silence.

110.    Counter-Defendants knew that their silence would induce the Counter-Plaintiffs into fulfilling their end of the agreement.

111.    Counter-Plaintiffs relied on and acted on their omissions.

112.    As a result, Counter-Plaintiffs suffered damages in excess of $75,000.

## COUNT IV: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

113.    Counter-Plaintiffs reallege and incorporate by reference all previous paragraphs as if fully set forth herein.

114.    Counter-Defendants' conduct was intentional.

115.    Counter-Defendant's conduct in all actions taken to pursue their goal of remaining in the United States by any means necessary including making false statements to current and former workers, government agencies and their representatives, and in pursuing litigation that they know is baseless, frivolous and otherwise without merit, was and is extreme, outrageous and of such a character as not to be tolerated by a civilized society.

116.    Counter-Defendants' conduct resulted in severe and serious emotional distress to Counter-Plaintiffs Emilto and Lucille.

117.    As a direct and proximate cause of Defendant's conduct, Plaintiff has suffered injuries and damages, past, present and future, in excess of $75,000 which includes but is not limited to: 1) Emotional distress; 2) Humiliation, mortification and embarrassment; 3)Sleeplessness and anxiety; and 4)Other injuries and damages and consequences that are found and/or develop or manifest themselves during the course of discovery and trial.

## COUNT V - CIVIL CONSPIRACY

118.    Counter-Plaintiffs reallege and incorporate by reference all previous paragraphs as if fully set forth herein.

119.    Counter-Defendants acted in concert as described above.

120.    Counter-Defendants acted in concert with third parties as described above and in ways yet to be discovered.

121.    They acted to defraud Counter-Plaintiffs and deprive them of their entitlement to income, rights to their property, interference with their business and to cause them intentional harm all in an effort to pursue their goal of remaining legally in the United States by any means necessary.

122.    These conspiratorial acts led to Counter-Plaintiffs suffering substantial losses as well as Plaintiffs incurring substantial liabilities.

123.    These acts were intentional, knowing, with malice and depravity of mind and without the consent or knowledge of the Counter-Plaintiffs.

124.    As a direct and proximate cause of Counter-Defendants' conspiratorial acts, Counter-Plaintiffs have suffered substantial loss in excess of $75,000 as well as Counter-Plaintiffs incurring substantial liabilities.

## Prayer for Relief

Wherefore, Counter-Plaintiffs hereby request that this honorable Court grant them the following relief:

A.  Declaration that Counter-Defendants breached the employment agreement and award Counter-Plaintiffs damages as permitted by law;

B.  Declaration that Counter-Defendants committed fraud as outlined in Counts II and III above and award Counter-Plaintiffs damages as permitted by law;

C.  Declaration that Counter-Defendants intentionally inflicted emotional distress on Emilto and Lucille as outlined in Count IV and award them damages as permitted by law;

D.   Declaration that Counter-Defendants conspired between themselves and others in such a a way as to cause harm to Counter-Plaintiffs and award them damages as permitted by law.

E.  Awarding any other relief that is just and proper under the law and that the Court deems necessary and appropriate.

## JURY TRIAL DEMAND

Counter-Plaintiffs hereby demand a jury trial on all claims.

Respectfully submitted,

/*s/ Robert Anthony Alvarez*
Avanti Law Group, PLLC
Robert Anthony Alvarez (P66954)
Attorney for Counter-Plaintiffs