UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LUIS GOMEZ-ECHEVERRIA, ET AL.,                Case No. 1:22-cv-00314

                                              HON. JANE M. BECKERING

           Plaintiffs,

      v.

PURPOSE POINT HARVESTING LLC,
EMILTO MORENO GOMEZ, and
LUCILLE JEAN MORENO,

           Defendants.

## DEFENDANT'S RESPONSE TO PLAINTIFF'S
## SECOND AMENDED COMPLAINT AND AFFIRMATIVE DEFENSES

1.      Plaintiffs Luis Gomez-Echeverria ("Luis"), Hervil Gomez-Echeverria ("Hervil")

and Julio Caesar Gomez Moreno ("Julio"), on behalf of themselves and others similarly situated,

and Plaintiffs Darwin Joel Fuentes Perez, Artemio Coronado Esteban, and Leonel Lopez y

Lopez, on behalf of themselves, (collectively "Plaintiffs") assert that Defendants individually

and jointly violated the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18

U.S.C. § 1589 *et seq.*, the Fair Labor Standards Act ("FLSA"), 29 U.S.C. 8 §201 *et seq.,* the

Michigan Workforce Opportunity Wage Act, MCL 408.411 *et seq.*, the Michigan Human

Trafficking victims Compensation Act, MCL 752.981 *et seq.*, and breached the H-2A contract

which set forth the terms and conditions of their employment.

**ANSWER:  Admitted that Plaintiffs purport to bring claims against Defendants as alleged.**

**Defendants deny that the Plaintiffs have any legal or factual support for those alleged**

**claims.**

1

2.    Defendants acted together in concert, charging Plaintiffs and the putative class members illegal recruitment fees, confiscating travel documents upon arrival in the United States, and paying less than the contract wage (and, at times, less than minimum wage).

**ANSWER:  Denied as untrue.**

## JURISDICTION AND VENUE

4.    This Court has jurisdiction under 28 U.S.C. § 1331 (Federal Question), 18 U.S.C. § 1595(a) (TVPRA), 29 U.S.C. § 216(b) FLSA, and under 28 U.S.C. § 1367 (supplemental jurisdiction) over Plaintiffs' state law claims that arise out of a common nucleus of operative facts.

**ANSWER:  Admitted.**

5.    Defendant Purpose Point Harvesting, LLC ("Purpose Point") is a Michigan company, whose address is 1535 Industrial Park Dr., Hart, MI 49420. Its registered agent is Lucille J. Moreno.

**ANSWER:  Admitted.**

6.    Defendants Emilto Moreno Gomez ("Emilto") and Lucille Jean Moreno ("Lucille") are Michigan residents and resided in this District at all relevant times.

**ANSWER:  Admitted.**

7.    Plaintiffs are migrant agricultural workers who were employed by Purpose Point to perform agricultural labor in Michigan through the H-2A program.

**ANSWER:  Admitted.**

8.    Plaintiffs worked for Defendants in Oceana and Newaygo Counties, Michigan, at a variety of farms.

**ANSWER:  Admitted.**

9.    The venue is proper in this Court under 28 U.S.C. § 1391(b)(1) as Defendants reside in this district.

**ANSWER:  Admitted.**

10.    The venue is proper in this Court under 28 U.S.C. § 1391(b)(2) as a substantial part of the events or omissions giving rise to the claim happened in this district.

**ANSWER:  Admitted.**

11.    At all times relevant to this action, Defendants were "employers" of Plaintiffs, and Plaintiffs were "employees" of Defendants, within the meaning of the FLSA and the Michigan Workforce Opportunity Wage Act (WOWA).

**ANSWER:  Admitted that Plaintiffs were employees of Defendant Purpose Point but denied that they were employees of Defendants Emilto & Lucille.**

12.    Upon information and belief, Defendants were an enterprise engaged in commerce or in the production of goods for commerce, as defined by 29 U.S.C. § 203(s) in that they had "employees engaged in commerce or in the production of goods for commerce, or … [had] employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person," and they had "an annual gross volume of sales made or business done" of not less than $500,000.

**ANSWER:  Admitted.**

13.    Upon information and belief, each of the Plaintiffs were individually engaged in commerce or in the production of goods for commerce.

**ANSWER:  Admitted.**

## FACTS

14.    Defendant Purpose Point is a company owned and operated by Defendants Emilto and Lucille.

**ANSWER:  Admitted.**

15.    Defendant Purpose Point is a farm labor contracting company.

**ANSWER:  Admitted.**

16.    Farms throughout west Michigan hire Purpose Point to provide workers who will plant, maintain, and harvest crops such as asparagus, apples, peaches, tomatoes, cherries, squash, Christmas trees, and much more.

**ANSWER:  Admitted.**

17.    Defendants rely on the H-2A program to find foreign workers for Michigan farms.

**ANSWER:  Admitted.**

18.    The H-2A program was created by 8 U.S.C. § 1188 and is implemented pursuant to the regulations found at 20 C.F.R. §§ 655.0-655.185. An agricultural employer in the United States may import H-2A workers if the USDOL certifies that (1) there are not enough U.S. workers to perform the job and (2) the employment of H-2A workers will not adversely affect the wages and working conditions of U.S. workers who are similarly employed. 8 U.S.C. § 1101(a)(15)(H)(ii)(a); 8 U.S.C. § 1188(a)(1).

**ANSWER:  Admitted only that the statutes and regulations cited herein speak for themselves but to the extent that any allegation is made that Defendants violated those statutes or regulations, it is denied as untrue.**

19.    Employers must file a temporary labor certification application with the U.S. DOL's Employment and Training Administration. 20 C.F.R. § 655.130 (2010). The application

must include a job offer, known as a "job order," that complies with the requirements of 20 C.F.R. § 655.122 (2010). The job order contains the terms to be offered to both foreign H-2A workers and domestic workers throughout the United States. *See* 20 C.F.R. § 655.121(a)(2).

**ANSWER:  Admitted only that the statutes and regulations cited herein speak for themselves but to the extent that any allegation is made that Defendants violated those statutes or regulations, it is denied as untrue.**

20.    The terms and conditions of the job orders, together with the requirements of 20 C.F.R. part 655, constituted employment contracts for Plaintiffs and others similarly situated. *See* 20 C.F.R. § 655.103(b) (definition of "work contract").

**ANSWER:  Admitted only that the regulations cited herein speak for themselves but to the extent that any allegation is made that Defendants violated those regulations or that Defendants breached any employment contract with Plaintiffs, it is denied as untrue.**

21.    The H-2A employment contracts at issue here contained a promise to "comply with applicable Federal, State and local law and regulations" including the FLSA and WOWA. *See* 20 C.F.R. § 655.135(e).

**ANSWER:  Admitted only that the regulations cited herein speak for themselves but to the extent that any allegation is made that Defendants violated those regulations or that Defendants breached any employment contract with Plaintiffs, it is denied as untrue.**

22.    In each year relevant to this action, Defendant Purpose Point submitted job orders to the U.S. DOL.

**ANSWER:  Admitted.**

23.    The 2017 and 2018 job orders' "Employer's Certification" sections were signed by Defendant Emilto, and the 2019 job order's "Employer's Certification" section was signed by Defendant Lucille.

**ANSWER:  Admitted.**

24.    In the employment contracts, Defendants promised that each worker would earn at least the Adverse Effect Wage Rate (AEWR), the prevailing hourly or piece rate wage, or the federal or state minimum wage, whichever is higher, for all hours worked in the payroll period.

**ANSWER:  Admitted as to Defendant Purpose Point, denied as to Emilto and Lucille. To the extent any allegation is made that Defendants failed to pay Plaintiffs as required, it is denied as untrue.**

25.    Plaintiffs' employment contracts promised to pay the applicable AEWR, which was $12.75 in 2017, $13.06 in 2018, and $13.54 in 2019.

**ANSWER:  Admitted.  To the extent any allegation is made that Defendants failed to pay Plaintiffs as required, it is denied as untrue.**

26.    In promising to pay the federally mandated AEWR, Defendants also promised to pay that wage free and clear without deduction of items for the employer's benefit or without reducing an employee's wages by shifting costs to their employees as incorporated into the parties' working arrangement and the written job order and as detailed in federal regulations at 20 C.F.R. § 655.122(p)(2).

**ANSWER:   Admitted only that the regulations cited herein speak for themselves but denied that Defendants Emilto & Lucille made any similar promises to Plaintiffs.  To the extent any allegation is made that Defendants failed to pay Plaintiffs as required or that they violated any employment agreement, it is denied as untrue.**

6

27.    Plaintiffs are migrant workers from San Marcos, Guatemala, an impoverished community in Guatemala.

**ANSWER:  Admitted.**

28.    There are few opportunities for paid, safe employment in or around San Marcos, Guatemala.

**ANSWER:  Denied as untrue.**

29.    There are no opportunities in or around San Marcos, Guatemala for Plaintiffs to earn wages comparable to those promised by Defendants to work in the United States.

**ANSWER:  Admitted that there are no opportunities in or around San Marcos, Guatemala for Plaintiffs to earn wages comparable to those promised by Defendant Purpose Point. Denied as to any reference to Emilto & Lucille having made any promises to Plaintiffs.**

30.    Defendant Emilto regularly recruits workers from Guatemala to work on Michigan farms.

**ANSWER:  Admitted that Defendant Purpose Point regularly recruits workers from Guatemala but denied as to Defendant Emilto as alleged.**

31.    Defendant Emilto also oversees day to day operations of employees at Purpose Point.

**ANSWER:  Admitted.**

32.    Defendant Lucille performs a variety of tasks at Purpose Point, including submitting applications to the USDOL Employment and Training Administration so that Purpose Point can bring workers to Michigan from Guatemala for work.

**ANSWER:  Denied as untrue.**

33.    Defendant Emilto is a relative of Plaintiffs Hervil and Luis.

**ANSWER:  Admitted that Emilto is first cousin to Plaintiffs Hervil and Luis.**

34.    In 2017, Emilto recruited Luis to work for Defendants on farms in Michigan.

**ANSWER:  Admitted.**

35.    In 2017, Emilto recruited Darwin to work for Defendants on farms in Michigan.

**ANSWER:  Denied as untrue. Plaintiff Luis referred Darwin to Purpose Point for**

**employment.**

36.    In 2017, Emilto recruited Leonel to work for Defendants on farms in Michigan.

**ANSWER:  Admitted.**

37.    In 2017, Emilto charged Luis $2,500 for the opportunity to work in the United

States.

**ANSWER:  Denied as untrue.**

38.    Emilto required Luis to pay the $2,500 before he left Guatemala.

**ANSWER:  Denied as untrue.**

39.    Emilto told Luis that these charges were to help the company.

**ANSWER:  Denied as untrue.**

40.    Luis paid Emilto this $2,500 recruitment fee in 2017.

**ANSWER:  Denied as untrue.**

41.    The $2,500 paid by Luis in 2017 was for the primary benefit of Defendants.

**ANSWER:  Denied as untrue.**

42.    In 2017, Emilto charged Darwin $2,500 for the opportunity to work in the United

States.

**ANSWER:  Denied as untrue.**

43.    Emilto required Darwin to pay the $2,500 before he left Guatemala.

8

**ANSWER:  Denied as untrue.**

44.    Darwin paid Emilto this $2,500 recruitment fee in 2017.

**ANSWER:  Denied as untrue.**

45.    The $2,500 paid by Darwin in 2017 was for the primary benefit of Defendants.

**ANSWER:  Denied as untrue.**

46.    In 2017, Emilto charged Leonel $2,500 for the opportunity to work in the United States.

**ANSWER:  Denied as untrue.**

47.    Emilto required Leonel to pay the $2,500 before he left Guatemala.

**ANSWER:  Denied as untrue.**

48.    Leonel paid Emilto this $2,500 recruitment fee in 2017.

**ANSWER:  Denied as untrue.**

49.    The $2,500 paid by Leonel in 2017 was for the primary benefit of Defendants.

**ANSWER:  Denied as untrue.**

50.    Upon information and belief, Defendants had a policy and procedure of charging each worker this fee before the start of each season.

**ANSWER:  Denied as untrue.**

51.    Upon information and belief, each worker did pay this fee to Emilto.

**ANSWER:  Denied as untrue.**

52.    Defendants never reimbursed Darwin, Luis, or Leonel for this $2,500 fee.

**ANSWER:  Denied as untrue.**

53.    Defendants never reimbursed other similarly situated workers for recruitment fees they paid.

**ANSWER:  Denied as untrue.**

54.    Upon arriving the in the United States, Emilto confiscated Darwin's passport and social security card.

**ANSWER:  Denied as untrue.**

55.    Upon arriving the in the United States, Emilto confiscated Luis's passport and social security card.

**ANSWER:  Denied as untrue.**

56.    Upon arriving the in the United States, Emilto confiscated Leonel's passport and social security card.

**ANSWER:  Denied as untrue.**

57.    Emilto kept these passports and social security cards during the entirety of their time in Michigan to prevent them from leaving their employment with Defendants.

**ANSWER:  Denied as untrue.**

58.    In total, Emilto retained Luis's, Darwin's, and Leonel's passports and social security cards for approximately six months.

**ANSWER:  Denied as untrue.**

59.    Darwin, Luis, and Leonel were never able to recover his passports or visas during the entire time he worked for Defendants in the United States.

**ANSWER:  Denied as untrue.**

60.    Their passports were only returned when the season ended and they were required to return to Guatemala.

**ANSWER:  Denied as untrue.**

61.    Upon information and belief, Emilto confiscated and retained the passports of other Guatemalan workers who worked for Purpose Point upon their arrival in Michigan.

**ANSWER:  Denied as untrue.**

62.    Defendants and their agents concealed, confiscated, and possessed Luis's, Darwin's, Leonel's, and other workers' passports and visas the entire time they worked in Michigan in order to, without lawful authority, maintain and restrict the workers' labor and to force them to work.

**ANSWER:  Denied as untrue.**

63.    For Luis to keep his job, Lucille required Luis to add her as a co-owner to his bank account. *See* PageID.355.

**ANSWER:  Denied as untrue.**

64.    Lucille had control over Luis's account.

**ANSWER:  Denied as untrue.**

65.    For Darwin to keep his job, Lucille required Darwin to add her as a co-owner to his bank account. *See* Exhibit A.

**ANSWER:  Denied as untrue.**

66.    Lucille had control over Darwin's account.

**ANSWER:  Denied as untrue.**

67.    For Leonel to keep his job, Lucille required Leonel to add her as a co-owner to his bank account. *See* Exhibit A.

**ANSWER:  Denied as untrue.**

68.    Lucille had control over Leonel's account.

**ANSWER:  Denied as untrue.**

69.    It was Defendants' pattern and practice to require all workers to create bank accounts with Lucille as a co-owner of those accounts.

**ANSWER:  Denied as untrue.**

70.    Luis, Darwin, and Leonel worked for Defendants.

**ANSWER:  Admitted that they worked for Defendant Purpose Point but denied as to Emilto and Lucille.**

71.    Luis, Darwin, Leonel, and others similarly situated worked at Michigan farms doing tasks including included driving, planting crops, maintaining plants, harvesting fruits and vegetables, and other farm labor.

**ANSWER:  Admitted.**

72.    Luis, Darwin, Leonel, and others similarly situated worked long hours for Defendants; Luis and other workers had to purchase headlamps so that they could work in the dark.

**ANSWER:  Admitted that they sometimes worked more than a regular seven hour day by their own choice, but denied that they were required to purchase headlamps.**

73.    For example, on some days Luis, Darwin, and Leonel would begin at 2:00 AM, and not finish until 10:00 PM, working 20 hours in a single day.

**ANSWER:  Denied as untrue.**

74.    Despite these long hours, Defendants did not pay Luis, Darwin, Leonel, and others similarly situated for all hours worked.

**ANSWER:  Denied as untrue.**

75.    Defendants failed to pay Luis, Darwin, Leonel, the federally required Adverse Effect Wage Rate of $12.75 for all hours worked in 2017.

**ANSWER:  Denied as untrue.**

76.    After the 2017 season ended, Luis, Darwin, Leonel, and the other similarly situated

workers returned to Guatemala.

**ANSWER:  Admitted.**

77.    In 2018, Emilto again recruited Luis to work in Michigan.

**ANSWER:  Denied as untrue.**

78.    In 2018, Emilto again recruited Darwin to work in Michigan.

**ANSWER:  Denied as untrue.**

79.    In 2018, Emilto again recruited Leonel to work in Michigan.

**ANSWER:  Denied as untrue.**

80.    In 2018, Emilto recruited Hervil to work in Michigan.

**ANSWER:  Denied as untrue.**

81.    In 2018, Emilto recruited Artemio to work in Michigan.

**ANSWER:  Denied as untrue.**

82.    In 2018, Emilto recruited Julio to work in Michigan.

**ANSWER:  Denied as untrue.**

83.    Despite the problems in 2017 and the illegal recruitment fee, Luis, Darwin, and

Leonel returned in 2018 because they lacked any other meaningful work opportunities.

**ANSWER:  Admitted that they returned to work in 2018 but denied that there were any**

**problems and/or illegal recruitment fees charged in 2017.**

84.    Other workers also returned in 2018.

**ANSWER:  Admitted.**

85.    Again, Emilto charged each worker $2,500 for the opportunity to come to

13

Michigan through Purpose Point to work on farms.

**ANSWER:  Denied as untrue.**

86.     Each Plaintiff paid this $2,500 recruitment fee in 2018.

**ANSWER:  Denied as untrue.**

87.     These charges were for the primary benefit of Defendants.

**ANSWER:  Denied as untrue.**

88.     Upon information and belief, Defendants had a policy and procedure of charging

each worker this fee before the start of the season.

**ANSWER:  Denied as untrue.**

89.     Prior to the 2018 season, Luis paid Hervil's fee through Luis's bank account.

**ANSWER:  Denied as untrue.**

90.     To recover Hervil's fee, Lucille wrote two checks for herself from Luis's bank

account. Copies of the two checks written by Lucille for Luis and Hervil's recruitment fees are at

PageID.357-358.

**ANSWER:  Denied as untrue.**

91.     These checks total $2,500.

**ANSWER:  Admitted that the checks on their face total $2,500.**

92.     Defendants did not ever reimburse any Plaintiff this $2,500 fee.

**ANSWER:  Denied that there was anything to reimburse as no recruitment fee was ever**

**charged.**

93.     Upon arriving in Michigan in 2018, some of the workers, including Plaintiffs, were

called to a meeting with Emilto and Lucille.

14

**ANSWER:  Denied as alleged as Defendants lack knowledge or information sufficient to form a belief about the truth of this allegation.**

94.    At this meeting, all of the workers present were forced to hand over their passports and social security cards to Emilto.

**ANSWER:  Denied as untrue.**

95.    Emilto kept Plaintiffs' passports during the entirety of their time in Michigan to prevent them from leaving Michigan and their jobs.

**ANSWER:  Denied as untrue.**

96.    In total, Emilto retained the passports of Plaintiffs and others similarly situated for approximately six months.

**ANSWER:  Denied as untrue.**

97.    Plaintiffs were never able to recover their passports or visas during the entire time they worked for Defendants in the United States.

**ANSWER:  Denied as untrue.**

98.    Their passports were only returned when the harvest season ended and the workers were required to return to Guatemala.

**ANSWER:  Denied as untrue.**

99.    Upon information and belief, Emilto confiscated and retained the passports of all of the other Guatemalan workers recruited to by Purpose Point and Emilto to work in Michigan.

**ANSWER:  Denied as untrue.**

100.    Defendants and their agents concealed, confiscated, and possessed Plaintiffs' passports and visas the entire time they worked in Michigan in order to, without lawful authority, maintain and restrict the workers' labor and to force them to work.

**ANSWER:  Denied as untrue.**

101.   Lucille required Hervil to add her to his bank account as an account owner.  This was mandatory and a condition of Hervil's employment.

**ANSWER:  Denied as untrue.**

102.   Upon information and belief, Defendants required all workers to create or keep a bank account with Lucille as a co-owner.

**ANSWER:  Denied as untrue.**

103.   Upon information and belief, all class workers worked similar hours.

**ANSWER:  Denied as untrue.**

104.   Defendants again failed to pay the AEWR, state minimum wage, and/or federal minimum wage for all hours worked in 2018.

**ANSWER:  Denied as untrue.**

105.   In 2019, Emilto recruited Plaintiffs Luis, Darwin, Julio, and others similarly situated, to work in Michigan.

**ANSWER:  Denied as untrue.**

106.   Despite the recruitment fees and other problems with work, Luis, Darwin, and Julio returned to work in Michigan because they lacked any other meaningful work opportunities.

**ANSWER:  Denied as untrue.**

107.   In 2019, Emilto again charged Luis, Darwin, Julio, and others similarly situated, $2,500 to get their jobs.

**ANSWER:  Denied as untrue.**

108.   Luis, Darwin, Julio, and others similarly situated, paid Emilto this $2,500 fee in 2019.

**ANSWER:  Denied as untrue.**

109.   In 2019, Defendants again failed to reimburse Luis, Darwin, Julio, and others similarly situated for these illegal recruitment fees in their first workweek.

**ANSWER:  Denied that there was anything to reimburse as there were no recruitment fees charged to Plaintiffs.**

110.   Defendants have never reimbursed Plaintiffs or others similarly situated for these illegal recruitment fees.

**ANSWER:  Denied that there was anything to reimburse as there were no recruitment fees charged to Plaintiffs.**

111.   In 2019, Emilto again confiscated the passports and social security cards of Luis, Darwin, and Julio.

**ANSWER:  Denied as untrue.**

112.   Upon information and belief, Emilto also confiscated and retained the passports of other Guatemalan workers recruited to by Purpose Point and Emilto to work in Michigan.

**ANSWER:  Denied as untrue.**

113.   Defendants and their agents concealed, confiscated, and possessed Plaintiffs' and other similarly situated workers' passports and visas the entire time they worked in Michigan in order to, without lawful authority, maintain and restrict the workers' labor and to force them to work.

**ANSWER:  Denied as untrue.**

114.    During the 2019 season, Emilto returned Luis, Darwin, and Julio's passports to them halfway during the season, but only in response to an immigration enforcement action in the area. However, he continued to keep their social security cards.

**ANSWER:  Denied as untrue.**

115.    Luis, Darwin, Julio, and others similarly situated worked long hours doing agricultural work on farms in West Michigan.

**ANSWER:  Admitted that workers of Purpose Point at times worked long hours by choice when presented the opportunity. Denied that the Plaintiffs are similarly situated to other workers.**

116.    At times, they were required to work from 2 AM to 10 PM.

**ANSWER:  Denied as untrue.**

117.    This could result in a 100-hour (or more) work week.  However, workers were only paid for, at most, 60 hours in a work week. This means that they were effectively paid $8.10 per hour (or less).

**ANSWER:  Denied as untrue.**

118.    Emilto recruited Plaintiffs and others similarly situated to work for Purpose Point in Michigan.

**ANSWER:  Denied as untrue.**

119.    Lucille and Emilto arranged for Plaintiffs to enter the United States through the H-2A program.

**ANSWER:  Admitted.**

120.    Emilto and Purpose Point transported Plaintiffs while in the United States.

**ANSWER:  Admitted.**

121.    Emilto and Purpose Point brought Plaintiffs to the United States to work at farms in Michigan.

**ANSWER:  Admitted.**

122.    Defendants exercised control over Plaintiffs and others similarly situated during the time they were employed at Purpose Point.  Among other things,

**ANSWER:  Admitted as to Purpose Point and Emilto, but denied as to Lucille. Denied that the Plaintiffs are similarly situated to other workers.**

   a.    Emilto confiscated Plaintiffs' and other workers' passports and social security cards to ensure that they could not travel or seek other employment.

**ANSWER:  Denied as untrue.**

   b.    Lucille controlled Plaintiffs' and other workers' bank accounts to ensure they paid whatever debts they owed to Emilto.

**ANSWER:  Denied as untrue.**

   c.    Emilto repeatedly warned Plaintiffs and other workers that he was friends with Department of Labor Assistant District Director Amador Diaz, and that Amador would tell him if anyone complained about him. (To be clear, this was a claim made by Emilto to control his employees. Plaintiffs do not know what relationship, if any, exists between Emilto and Amador Diaz).

**ANSWER:  Denied as untrue.**

   d.    Emilto repeatedly threatened to put a "stain" on workers' passports that would prevent them from entering the H-2A program again.

**ANSWER:  Denied as untrue.**

19

    e.   Emilto repeatedly threatened workers that if they complained or cooperated with any investigations, he would make sure they were put on a list that permanently barred them from being hired through the H-2A program.

**ANSWER:  Denied as untrue.**

    f.   To avoid scrutiny, Emilto would not take injured or sick workers to established medical clinics unless absolutely necessary. For example, when Hervil was injured on the job, Emilto took him to see a friend, Dr. Loren Reed, at Dr. Reed's personal residence.

**ANSWER:  Denied as untrue.**

    g.   Through charging the Plaintiffs recruitment fees, Emilto made Plaintiffs and other workers dependent on their jobs to make the money back.

**ANSWER:  Denied as untrue.**

    h.   By underpaying Plaintiffs, Emilto ensured that Plaintiffs and other workers couldn't afford to quit.

**ANSWER:  Denied as untrue.**

    i.   When Plaintiff Luis fled Defendants' operation, Emilto filed a missing person's report in an attempt to use the Michigan State Police's resources to force him to return to work.  *See* Missing Person Report, PageID.340-351.

**ANSWER:  Denied as untrue.**

    j.   Through an intermediary, Emilto posted on Facebook the photos of workers who had fled, hoping that private persons would return them to Defendants, saying that they were missing, possibly in danger, and that immigration and "special agents" would be looking for these men. (*translation*: "They have been reported as

missing and will soon appear on the pages of missing people in Walmarts and in any commercial place because until today it is not known if they were kidnapped or if they are in danger, immigration and secret agents will begin to track them down.")   *See* PageID.353:

**ANSWER:  Denied as untrue.**



123.   Plaintiffs feared serious harm through loss of income and permanent loss of economic opportunity if they did not continue working for Emilto and paying him.

**ANSWER:  Denied as untrue.**

124.   Defendants' actions caused Plaintiffs anxiety, worry, and apprehension.

**ANSWER:  Denied as untrue.**

125.    A reasonable individual in Plaintiffs' position would feel compelled to provide the labor and services in question.

**ANSWER:  Denied as untrue.**

126.    Plaintiffs' fears were reasonable.

**ANSWER:  Denied as untrue.**

127.    Defendants took the above actions to force Plaintiffs to work for Purpose Point alone to the financial benefit of co-Defendants Emilto and Lucille while Plaintiffs were in the United States.

**ANSWER:  Denied as untrue.**

<u>**COUNT I**</u>
<u>**THE WILLIAM WILBERFORCE TRAFFICKING VICTIMS PROTECTION REAUTHORIZATION ACT OF 2008**</u>

128.    Plaintiffs reallege and incorporate the allegations set forth above.

**ANSWER:  Defendants reassert and incorporate their responses to the allegations as set forth above.**

129.    The TVPRA allows victims to "bring a civil action against... whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of [the TVPRA]". 18. U.S.C. § 1595(a).

**ANSWER:  Admitted only that the statutes and regulations cited herein speak for themselves but to the extent that any allegation is made that Defendants violated those statutes or regulations, it is denied as untrue.**

130.    Defendants Lucille and Emilto profited financially from operating Purpose Point.

**ANSWER:  Admitted.**

131.    Defendants, either by themselves or through their agents, recruited, harbored, and transported Plaintiffs and class members from their home countries to Michigan.

**ANSWER:  Admitted that Purpose Point, through it's agents, recruited and transported Plaintiffs and other workers from their home countries to Michigan. Any remaining allegations are denied as untrue.**

132.    Defendants, either by themselves or through their agents, transported Plaintiffs and each putative class member from their housing in Michigan to the work sites.

**ANSWER:  Admitted that Purpose Point, through it's agents, transported Plaintiffs and other workers from their employer provided housing to work sites in Michigan. Any remaining allegations are denied as untrue.**

133.    Defendants, either by themselves or through their agents, provided Plaintiffs and putative class members as workers to farms in west Michigan.

**ANSWER:  Admitted that Purpose Point provided Plaintiff and other workers with employment at various farms in West Michigan. Any remaining allegations are denied as untrue.**

134.    Defendants, either by themselves or through their agents, did so to obtain labor and services from Plaintiffs and the putative class members.

**ANSWER:  Admitted as to Purpose Point. Any remaining allegations are denied as untrue.**

135.    Defendants accomplished this by means of fraud and coercion, including through threatening immigration detention and deportation, reputational harm, misrepresentation of terms of employment, illegal wage withholdings, and deductions and intimidation in violation of 18 U.S.C. § 1589(a).

**ANSWER:  Denied as untrue.**

23

136.    Defendant Emilto threatened to bar Plaintiffs and other workers from the H-2A program.

**ANSWER:  Denied as untrue.**

137.    Losing access to the H-2A program would be the loss of great economic opportunity to the Plaintiffs and others similarly situated, because they relied on their H-2A work to obtain income to support their families.

**ANSWER:  Defendants lack knowledge or information sufficient to form a belief about the truth of this allegation. To the extent there are any allegations that Defendants committed some wrongdoing, those allegations are denied as untrue.**

138.    Defendants operated a scheme, plan or pattern intended to cause the H-2A workers in the program to believe that any non-performance or disobedience would result in serious financial, psychological and/or reputational harm in order to exert pressure on the workers to continue working for Purpose Point and refrain from seeking employment elsewhere. 18 USCS § 1589(a)(4).

**ANSWER:  Denied as untrue.**

139.    Through their actions, Defendants obtained the labor and services of Plaintiffs and others similarly situated by means of the abuse or threated abuse of law and the legal process 18 U.S.C. § 1589(a)(3).

**ANSWER:  Denied as untrue.**

140.    Plaintiffs and others similarly situated suffered substantial emotional, mental, and financial harm as a result of this conduct.

**ANSWER:  Denied as untrue.**

141.    Plaintiffs are therefore entitled to recover compensatory and punitive damages and attorneys' fees and costs under 18 U.S.C. § 1595(a).

**ANSWER:  Denied as untrue.**

142.    Defendants Emilto and Lucille, in their capacity as owners of Purpose Point, and Defendant Purpose Point itself, have direct liability under the Act as they directly benefited from their conduct of extracting monies to pay the $2,500 recruitment fees.

**ANSWER:  Denied as untrue.**

143.    Alternatively, all Defendants have beneficiary liability as they knowingly benefited from the conduct of extracting monies to pay the $2,500 recruitment fee.

**ANSWER:  Denied as untrue.**

144.    Representative Plaintiffs Luis, Hervil, and Julio bring these claims on behalf of all H-2A workers who worked for Defendant Purpose Point in 2017, 2018, and/or 2019.

**ANSWER:  Admitted that Plaintiffs purport to bring claims on behalf of other workers but denied as untrue that there are any valid claims to pursue nor that Plaintiffs are similarly situated or adequate representatives of other workers.**

145.    Plaintiffs and putative class members bring these claims against all Defendants.

**ANSWER:  Admitted that Plaintiffs purport to bring claims on behalf of other workers against Defendants but denied as untrue that there are any valid claims to pursue nor that Plaintiffs are similarly situated or adequate representatives of other workers.**

## COUNT II
## MICHIGAN HUMAN TRAFFICKING VICTIMS COMPENSATION ACT

146.    Plaintiffs reallege and incorporate the allegations set forth above.

**ANSWER:  Defendants reassert and incorporate their responses to the allegations as set forth above.**

25

147.   When a defendant violates the forced labor and human trafficking sections of the Michigan Penal Code (Sections 750.462a-750.462h), it is liable to its victims under the Human Trafficking Victims Compensation Act (MIHTVC). MCL 752.983(1)

**ANSWER:  Admitted only that the statutes cited herein speak for themselves but to the extent that any allegation is made that Defendants violated those statutes or regulations, it is denied as untrue.**

148.   Section 750.462a defines forced labor as "labor or services that are obtained or maintained by fraud, force, or coercion."

**ANSWER:  Admitted only that the statutes cited herein speak for themselves but to the extent that any allegation is made that Defendants violated those statutes or regulations, it is denied as untrue.**

149.   That same section defines coercion to include threats, abuse (or threatened abuse) of the legal system, and confiscating passports or other documents.

**ANSWER:  Admitted only that the statutes cited herein speak for themselves but to the extent that any allegation is made that Defendants violated those statutes or regulations, it is denied as untrue.**

150.   Knowingly confiscating a person's passport, immigration document, or other government identification document is, by definition, coercion under Michigan law. MCL 750.462a(b)(iii).

**ANSWER:  Admitted only that the statutes and regulations cited herein speak for themselves but to the extent that any allegation is made that Defendants violated those statutes or regulations, it is denied as untrue.**

151.    MCL 750.462a(h) defines that fraud "includes, but is not limited to, a false or deceptive offer of employment or marriage.

**ANSWER:  Admitted only that the statutes and regulations cited herein speak for themselves but to the extent that any allegation is made that Defendants violated those statutes or regulations, it is denied as untrue.**

152.    The $2,500 fee rendered the job offer false and deceptive.

**ANSWER:  Denied that there was any fee charged to Plaintiffs. Any remaining allegations are denied as untrue.**

153.    Defendants' representations to the USDOL regarding the working conditions the H-2A workers would work under were fraudulent when made.

**ANSWER:  Denied as untrue.**

154.    Defendants used these fraudulent representations to recruit Plaintiffs and others similarly situated.

**ANSWER:  Denied as untrue.**

155.    Defendant Emilto's confiscation of the passports of Plaintiffs and others similarly situated amount to coercion.

**ANSWER:  Denied as untrue.**

156.    Defendant Emilto's threats to bar Plaintiffs and others similarly situated from the H-2A program was a threatened abuse of the legal system and amounts to coercion.

**ANSWER:  Denied as untrue.**

157.    Plaintiffs and class members worked for Defendants.

**ANSWER: Admitted that Plaintiffs other workers they seek to represent worked for Purpose Point. Any remaining allegations are denied as untrue.**

158.    Therefore, Defendant Emilto knowingly recruited, enticed, harbored, transported, and provided Plaintiffs and others similarly situated for forced labor, in violation of MCL 750.462b.

**ANSWER:  Denied as untrue.**

159.    Defendant Purpose Point and Defendant Lucille both knowingly benefitted financially from Defendant Emilto's actions, in violation of MCL 750.462d.

**ANSWER:  Denied as untrue.**

160.    Plaintiffs and others similarly situated suffered economic losses through unpaid wages and lost economic opportunities because of Defendants' actions.

**ANSWER:  Denied as untrue.**

161.    Plaintiffs and others similarly situated suffered mental anguish and other noneconomic damages as the result of Defendants' actions.

**ANSWER:  Denied as untrue.**

162.    Defendants are liable to Plaintiffs and others similarly situated for economic and noneconomic damages under MCL 752.983.

**ANSWER:  Denied as untrue.**

163.    Representative Plaintiffs Luis, Hervil, and Julio bring this claim on behalf of all H-2A workers who worked for Defendant Purpose Point in 2017, 2018, and/or 2019.

**ANSWER:  Admitted that Plaintiffs Luis, Hervil and Julio purport to bring this claim on behalf of other workers but denied as untrue that there is a valid claim to pursue nor that these Plaintiffs are representative of any other workers.**

164.    Plaintiffs and class members bring this claim against all Defendants.

**ANSWER:  Admitted that Plaintiffs purport to bring this claim on behalf of other workers against Defendants but denied as untrue that there are any valid claims to pursue nor that Plaintiffs are similarly situated or adequate representatives of other workers.**

## COUNT III
### FAIR LABOR STANDARDS ACT

165.    Plaintiffs reallege and incorporate the allegations set forth above.

**ANSWER:  Defendants reassert and incorporate their responses to the allegations as set forth above.**

166.    Defendant Purpose Point is an employer under 29 U.S.C. § 203(d).

**ANSWER:  Admitted.**

167.    Defendant Emilto had the authority to hire and fire Plaintiffs and other similarly situated workers.

**ANSWER:  Admitted.**

168.    Defendant Emilto supervised the work of Plaintiffs and other similarly situated workers.

**ANSWER:  Admitted.**

169.    Defendant Emilto supervised and controlled the work schedule of Plaintiffs and other similarly situated workers.

**ANSWER:  Admitted.**

170.    Defendant Emilto acted in the interest of Defendant Purpose Point by, among other things, hiring and recruiting workers for Defendant Purpose Point.

**ANSWER:  Admitted.**

171.    Defendant Emilto is an employer under 29 U.S.C. § 203(d).

**ANSWER:  Denied as untrue.**

172.    The job order (ETA Form 790) set employee pay rates in 2019.

**ANSWER:  Admitted.**

173.    Defendant Lucille signed the job order in 2019.

**ANSWER:  Admitted.**

174.    Upon information and belief, Defendant Lucille maintained Plaintiffs' and other similarly situated workers' employment records, as understood by 29 CFR § 791.2(a)(2).

**ANSWER:  Admitted.**

175.    Defendant Lucille drove workers to and from fields to work, which effectively controlled the work schedule of Plaintiffs and other similarly situated workers.

**ANSWER: Denied as untrue.**

176.    Defendant Lucille signed the paychecks of Plaintiffs and other similarly situated workers.

**ANSWER:  Admitted.**

177.    Defendant Lucille acted in the interest of Defendant Purpose Point by, among other things, filing the job order and maintaining employment records.

**ANSWER:  Admitted.**

178.    Defendant Lucille exercised control over Plaintiffs and other similarly situated workers by requiring them to add her as a co-owner to their bank accounts.

**ANSWER: Denied as untrue.**

179.    Defendant Lucille is an employer under 29 U.S.C. § 203(d).

**ANSWER:  Denied as untrue.**

180.    Defendants failed to keep and maintain accurate time records are required by 29 U.S.C. §211 (c); 29 C.F.R. Part 516.

**ANSWER:  Denied as untrue.**

181.   The recruitment fees charged by Defendant Emilto were for the benefit of Defendants.

**ANSWER:  Denied that there were any fees charged. Any remaining allegations are denied as untrue.**

182.   Therefore, Defendants were required to reimburse Plaintiffs and other class members in the first week of their employment if the fees brought Plaintiffs' compensation under the minimum wage.  *See Arriaga v. Fla Pacific Farms, LLC*, 305 F.3d 1228, 1237 (11th Cir. 2002) ("Workers must be reimbursed during the first workweek for pre-employment expenses which primarily benefit the employer, to the point that wages are at least equivalent to the minimum wage.")

**ANSWER:  Denied that there were any fees charged. Any remaining allegations are denied as untrue.**

183.   Defendants did not reimburse Plaintiffs or others similarly situated during their first weeks of work.

**ANSWER:  Denied that there was anything to reimburse. Any remaining allegations are denied as untrue.**

184.   To avoid a minimum wage violation under *Arriaga*, after the deduction of $2,500 from the wages, Defendants would have had to pay Plaintiffs and other similarly situated workers for approximately 184.64 hours using a $13.54 hourly rate, or 344.82 hours using a $7.25 hourly rate at the AEWR.

**ANSWER:  Defendants lack knowledge or information sufficient to form a belief about the truth of this allegation. To the extent it is alleged that Defendants violated the FLSA, it is denied as untrue.**

185.    Defendants did not pay plaintiffs for the hours that related to the $2,500 in wages.

**ANSWER: Denied as untrue.**

186.    Defendants were required to keep accurate pay records for all employees.

**ANSWER: Admitted.**

187.    Therefore, the exact degree of damages for this first week of work may be calculated with the production of Defendants' records.

**ANSWER: Denied that Plaintiffs or other workers are owed any damages under the FLSA. Any remaining allegations are denied as untrue.**

188.    Defendants failed to pay Plaintiffs and class members the federal minimum wage for at least some weeks in 2019.

**ANSWER: Denied as untrue.**

189.    Plaintiffs Luis and Julio have consented to bring suit in this action. Copies of their written consent have been filed at PageID.360 and PageID.362.

**ANSWER:  Admitted that Plaintiffs Luis and Julio purport to have signed a written consent to sue.**

190.    Defendants are liable to Plaintiffs Luis and Julio for violations of the FLSA in 2019.

**ANSWER: Denied as untrue.**

191.    As an alternative theory to joint employer liability, Plaintiffs bring this claim against Purpose Point, and if it is undercapitalized will seek to hold all Defendants liable by piercing the corporate veil.

**ANSWER:  Denied that there is a valid claim to pursue under the FLSA against Defendants. Admitted that Plaintiffs purport to present an alternative theory of liability but denied that this alternative theory is applicable to Defendants.**

**COUNT IV**
**MICHIGAN WORKFORCE OPPORTUNITY WAGE ACT**

192.    Plaintiffs reallege and incorporate the allegations set forth above.

**ANSWER:  Defendants reassert and incorporate their responses to the allegations as set forth above.**

193.    Under WOWA, the minimum wage in Michigan was $9.45 per hour after March 29, 2019.

**ANSWER:  Admitted.**

194.    Defendant Purpose Point is an employer under MCL 408.412.

**ANSWER:  Admitted.**

195.    In WOWA's definition of employer, WOWA includes "a person acting in the interest of the employer." MCL 480.112(d).

**ANSWER:  Admitted only that the statute speaks for itself. Any remaining allegations are denied as untrue.**

196.    Defendant Emilto acted in Purpose Point's interest.

**ANSWER:  Admitted.**

197.    Therefore, Defendant Emilto is an employer under MCL 408.412.

**ANSWER:  Denied as untrue.**

198.   Defendant Lucille acted in Purpose Point's interest.

**ANSWER:  Admitted.**

199.   Therefore, Defendant Lucille is an employer under MCL 408.412.

**ANSWER:  Denied as untrue.**

200.   Defendants failed to pay Plaintiffs Darwin, Luis, Julio, and other similarly situated workers the state minimum wage in 2019 for at least some work weeks.

**ANSWER:  Denied as untrue.**

201.   Representative Plaintiffs Luis and Julio bring this claim on behalf of all H-2A workers who worked for Defendant Purpose Point in 2019.

**ANSWER:  Admitted that Plaintiffs Luis and Julio purport to bring this claim on behalf of other workers against Defendants but denied as untrue that there are any valid claims to pursue nor that Plaintiffs are similarly situated or adequate representatives of other workers.**

## COUNT V
## BREACH OF CONTRACT

202.   Plaintiffs reallege and incorporate the allegations set forth above.

**ANSWER:  Defendants reassert and incorporate their responses to the allegations as set forth above.**

203.   The job orders, submitted and approved by the ETA, constitute legal contracts between Defendant Purpose Point and Plaintiffs and other class members.

204.   Copies of job orders are already on record at PageID.364-458.

**ANSWER: Admitted only that the documents referenced purport to be copies of job orders. Any remaining allegations are denied as untrue.**

205.    In 2017, Defendant Purpose Point promised to pay Plaintiffs Luis, Darwin, Leonel, and other similarly situated workers $12.75 an hour for each hour worked.

**ANSWER: Admitted.**

206.    In 2017, Defendant Purpose Point failed to pay Plaintiffs Luis, Darwin, Leonel, and other similarly situated workers $12.75 an hour for each hour worked.

**ANSWER: Denied as untrue.**

207.    In 2018, Defendant Purpose Point promised to pay all Plaintiffs $13.06 an hour for each hour worked.

**ANSWER:  Admitted.**

208.    In 2018, Defendant Purpose Point failed to pay all Plaintiffs $13.06 an hour for each hour worked.

**ANSWER:  Denied as untrue.**

209.    In 2019, Defendant Purpose Point promised to pay Plaintiffs Darwin, Luis, and Julio $13.54 an hour for each hour worked.

**ANSWER:  Admitted.**

210.    In 2019, Defendant Purpose Point failed to pay Plaintiffs Darwin, Luis, and Julio $13.54 an hour for each hour worked.

**ANSWER:  Denied as untrue.**

211.    Each relevant year, Defendant Purpose Point promised not to charge a recruitment fee to its workers.

**ANSWER:  Admitted.**

212.    Each year, Emilto did charge a recruitment fee to each Plaintiff.

**ANSWER:  Denied as untrue.**

213.    By taking the actions described above, Defendant Purpose Point breached its contracts with Plaintiffs and class members.

**ANSWER:  Denied as untrue.**

214.    As a result of these breaches, Plaintiffs and class members were not paid for all hours worked.

**ANSWER:  Denied as untrue.**

215.    Plaintiffs and class members are entitled to damages for all time worked for which they were not paid the appropriate rate.

**ANSWER:  Denied as untrue.**

216.    Plaintiffs Luis, Hervil, and Julio bring this claim against Defendant Purpose Point on behalf of all H-2A workers that worked for Purpose Point in 2017, 2018, and 2019.

**ANSWER:  Admitted that Plaintiffs Luis, Hervil and Julio purport to bring this claim on behalf of other workers against Defendants but denied as untrue that there are any valid claims to pursue nor that Plaintiffs are similarly situated or adequate representatives of other workers.**

## CLASS ALLEGATIONS

217.    Plaintiffs propose a class and a sub class.

**ANSWER:  Admitted that Plaintiffs purport to bring this claim on behalf of other workers but denied as untrue that there are any valid claims to pursue, that Plaintiffs are similarly situated or adequate representatives of other workers nor that the claim is properly brought as a class claim.**

218.    The first is a class of all H-2A workers who worked for Defendant Purpose Point in 2017, 2018, and 2019. This is identified as "the Class".

**ANSWER:  Admitted that Plaintiffs purport to bring this claim on behalf of other workers but denied as untrue that there are any valid claims to pursue, that Plaintiffs are similarly situated or adequate representatives of other workers nor that the claim is properly brought as a class claim.**

219.    The second is a minimum wage subclass for all H-2A workers who worked for Defendant Purpose Point in 2019. This is identified as "the Minimum Wage Subclass."

**ANSWER:  Admitted that Plaintiffs purport to bring this claim on behalf of other workers but denied as untrue that there are any valid claims to pursue, that Plaintiffs are similarly situated or adequate representatives of other workers nor that the claim is properly brought as a class claim.**

220.    Between 70 and 139 H-2A workers are members of the Class.

**ANSWER:  Admitted that Plaintiffs purport to bring this claim on behalf of other workers but denied as untrue that there are any valid claims to pursue, that Plaintiffs are similarly situated or adequate representatives of other workers nor that the claim is properly brought as a class claim.**

221.    As many as 70 H-2A workers are members of the Minimum Wage Subclass.

**ANSWER:  Admitted that Plaintiffs purport to bring this claim on behalf of other workers but denied as untrue that there are any valid claims to pursue, that Plaintiffs are similarly situated or adequate representatives of other workers nor that the claim is properly brought as a class claim.**

222.    Plaintiffs Luis, Hervil, and Julio will seek to be the Representative Plaintiffs for the Class.

**ANSWER:  Admitted that Plaintiffs Luis, Hervil and Julio purport to bring this claim on behalf of other workers but denied as untrue that there are any valid claims to pursue, that these Plaintiffs are similarly situated or adequate representatives of other workers nor that the claim is properly brought as a class claim.**

223.   Plaintiffs Luis and Julio will seek to be the Representative Plaintiffs for the Class and Minimum Wage Subclass.

**ANSWER:  Admitted that Plaintiffs Luis and Julio purport to bring this claim on behalf of other workers but denied as untrue that there are any valid claims to pursue, that these Plaintiffs are similarly situated or adequate representatives of other workers nor that the claim is properly brought as a class claim.**

224.   There are questions of law and fact common to each class that predominate over any questions affecting only individual class members.

**ANSWER: Denied as untrue.**

225.   The predominate questions for the class include whether Defendants' actions amount to human trafficking, whether Defendant Emilto charged class members illegal recruiting fees, and whether Defendant Purpose Point breached its contract with class members.

**ANSWER:  Denied as untrue.**

226.   The predominate questions for the minimum wage subclass include whether Defendants paid class members the minimum wage under state and federal law.

**ANSWER:  Denied as untrue.**

227.   Representative Plaintiffs will fairly and adequately represent the class.

**ANSWER:  Denied as untrue.**

228.    Representative Plaintiffs have retained counsel experienced in handling farmworker claims and class actions.

**ANSWER:  Defendants lack knowledge or information sufficient to form a belief about the truth of this allegation. Any remaining allegations are denied as untrue.**

229.    A class action is an appropriate method for the fair and efficient adjudication of this controversy.

**ANSWER: Denied as untrue.**

## <u>AFFIRMATIVE DEFENSES</u>

A. Plaintiffs' claims are barred by the doctrines of estoppel and waiver.

B. Plaintiffs' claims are barred by the doctrines of accord and satisfaction.

C. Plaintiffs' claims are barred because Defendant acted in good faith and reasonably believed that its actions complied with the law, including the Fair Labor Standards Act and the Michigan Minimum Wage Law;

D. Plaintiffs' claims are barred by the doctrine of unclean hands;

E. Plaintiffs' claims do not meet the legal and factual requirements for Rule 23 class action status;

F. Named Plaintiffs are not adequate representatives of the proposed class;

G. Plaintiffs' and members of the proposed collective action are not similarly situated;

H. Plaintiffs' claims are barred by Plaintiffs' failure to mitigate their damages or, if any attempts to mitigate were undertaken, by Plaintiffs' failure to properly mitigate damages whether by foreseeable means or otherwise;

I. Plaintiffs have failed to state a claim or cause of action upon which relief may be granted;

J.   The damages alleged by Plaintiffs may have been proximately caused or contributed to by an intervening, superceding event;

K.   The damages alleged by Plaintiff may have been proximately caused or contributed to by the negligence of Plaintiff, which acts of negligence include, by way of illustration and limitation, the following:

    a.   failing to act as a reasonably prudent person under circumstances existing;

    b.   failing to take adequate and reasonable precautions for the well-being of her property.

L.   Plaintiffs' themselves breached the contract and violated the implied warranty of good faith dealing by acting unreasonably;

## **RESERVATION AND NON-WAIVER**

The Defendants intend to reserve their respective rights to assert and do not waive any additional or further defenses as may be revealed by subsequent discovery or subsequently acquired information.

## **JURY TRIAL DEMAND AND RELIANCE ON PLAINTIFFS' JURY DEMAND**

Defendants hereby demand a jury trial on all claims and rely on Plaintiffs' jury demand.

Respectfully submitted,

*/s/ Robert Anthony Alvarez*
Avanti Law Group, PLLC
Robert Anthony Alvarez (P66954)
Attorney for Defendants